IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JANET D. MIMS,                          §
                                        §
         Plaintiff,                     §
                                        §
v.                                      §         CIVIL NO. H-09-01245
                                        §
MICHAEL J. ASTRUE,                      §
COMMISSIONER OF THE                     §
SOCIAL SECURITY ADMINISTRATION,         §
                                        §
         Defendant.                     §
                                        §

## MEMORANDUM OPINION

Pending before the court[1] are Plaintiff's Motion to Supplement the Administrative Record with New and Material Evidence (Docket Entry No. 16) and Plaintiff's Motion for Summary Judgment (Docket Entry No. 17).  The court has considered the motions, all relevant filings, and the applicable law.

For the reasons set forth below, the court **DENIES** Plaintiff's Motion to Supplement (Docket Entry No. 16) and **GRANTS** Plaintiff's Motion for Summary Judgment (Docket Entry No. 17).  The case is **REMANDED** to the Commissioner for reconsideration consistent with this opinion.

## I.  Case Background

Plaintiff Janet D. Mims ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an

---

[1] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 11, 13, 16, 24, 25.

unfavorable decision by the Commissioner of the Social Security Administration ("Defendant" or "Commissioner") regarding Plaintiff's claims for supplemental security income benefits under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 401 et seq.[2]

A.    **Procedural History**

Plaintiff filed for disability benefits on March 2, 2006,[3] alleging disability since July 1, 2004, as a result of a heart disorder, a thyroid disorder, high blood pressure, and bronchitis.[4] After Plaintiff's application was denied at the initial[5] and reconsideration levels,[6] she requested a hearing before an Administrative Law Judge of the Social Security Administration ("ALJ").[7]   The ALJ granted Plaintiff's request and conducted a hearing in Houston, Texas, on May 20, 2008.[8]  After listening to testimony presented at the hearing and reviewing the medical record, the ALJ issued an unfavorable decision on June 18, 2008.[9]

On February 12, 2009, the Appeals Council denied Plaintiff's

---

[2]    Pl.'s Summ. J. Mot., Docket Entry No. 17, p. 2.

[3]    Transcript of the Administrative Proceedings ("Tr.") 114.

[4]    Tr. 135.

[5]    Tr. 67.

[6]    Tr. 73.

[7]    Tr. 77.

[8]    Tr. 13, 84, 98.

[9]    Tr. 23.

2

request for review, thereby making the ALJ's decision the final decision of the Defendant.[10]  Having exhausted her administrative remedies, Plaintiff filed this timely civil action pursuant to 42 U.S.C. § 405(g) for judicial review of the Defendant's unfavorable decision.

**B.   Factual History**[11]

**1.   Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on March 13, 1964, and was forty-four years old at the time of the hearing before the ALJ.[12]  The record contains discrepancies with respect to her educational level, but she did not graduate high school.[13]  She has no past relevant work experience.[14]

**2.   Plaintiff's Testimony**

---

[10]    Tr. 1.

[11]    The parties only dispute the ALJ's decision with respect to his determination of Plaintiff's alleged mental impairment.  See Plaintiff's Motion for Summary Judgment, Docket Entry No. 17, pp. 4-6; Defendant's Response to Plaintiff's Motion for Summary Judgment, Docket Entry No. 23, pp. 4-7.  Thus, the following factual history will focus on Plaintiff's alleged mental impairment.

[12]    Tr. 35, 62.

[13]    Tr. 211.  Plaintiff's adult disability report, form SSA-3368, states that she completed eleventh grade and did not attend special education classes, although Plaintiff could not report the approximate date she finished eleventh grade.  Tr. 140.  A psychiatric disability determination examination report states that Plaintiff had a tenth grade education.  Tr. 210.  A psychological report states that Plaintiff did not complete the tenth grade and was placed in special education classes.  Tr. 439.  The ALJ did not attempt to clarify these discrepancies by questioning Plaintiff about them during the hearing.  See Tr. 30-58.  When posing a hypothetical to the vocational expert, however, the ALJ assumed a person with an eleventh grade education.  Tr. 56.

[14]    Tr. 21.

At the hearing on May 20, 2008, Plaintiff testified that she was unmarried and had six living children, two of whom lived in Louisiana; the rest lived in the Houston area.[15] Her youngest three children were ages seventeen, eighteen, and nineteen, while the older three were in their twenties, although Plaintiff could not recall their exact ages.[16]

Plaintiff received no money from the government for her housing, and her children contributed to help pay her $470 monthly rent.[17] She lived with her three youngest children and her grandchild by the nineteen-year-old.[18] She could not remember the grandchild's age but said that the little girl was walking.[19] Plaintiff's nineteen-year-old worked at a cash register, although Plaintiff could not remember where, while the younger two children went to school.[20] Two of Plaintiff's daughters and a neighbor named Christine helped care for the grandchild, because they had different work/school schedules.[21] Plaintiff played with and talked

---

[15]     Tr. 35.  Plaintiff had not seen her two sons who lived in Louisiana in three years, when they had last come to Houston to visit her.  Tr. 36, 53.

[16]     Tr. 36.

[17]     Tr. 41-42.

[18]     Tr. 36-37.  Plaintiff had a total of six grandchildren.  Tr. 36.

[19]     Tr. 36.

[20]     Tr. 37-38.

[21]     Tr. 53-54.

to her grandchild but could not help care for her.[22]

Plaintiff neither had a driver's license nor used the bus system, and, as a result, someone drove her whenever she traveled around Houston.[23]  Plaintiff disclosed that she mainly stayed at home she was on medication.[24]  She occasionally left her home to go to the store, but she always was accompanied by one of her children or a friend.[25]

Plaintiff's only source of income was from Temporary Assistance for Needy Families, from which she received $120 for her seventeen-year-old boy.[26]  She had been receiving this aid for a while but could not remember for how long.[27]  Plaintiff said that her nineteen-year-old received food stamps.[28]

At the time of the hearing, Plaintiff's mother was wheelchair-bound and living in Houston, although not close to where Plaintiff lived.[29]  She talked to her mother on the telephone nearly every day but had not seen her in a month, when her daughters had last driven

---

[22]    Tr. 38.

[23]    Tr. 38-39.  A long-time family friend, Mr. Womack, drove Plaintiff to and from the hearing.  Tr. 38.

[24]    Tr. 39.

[25]    Tr. 39.

[26]    Tr. 39.  The record was unclear how often Plaintiff received that sum.

[27]    Tr. 39.

[28]    Tr. 39.

[29]    Tr. 40.

Plaintiff to see her.[30]

Plaintiff could not remember the last time she worked, but she said she had last worked at Lowe's Home Improvement dusting and painting.[31]  She was only there for three days before she had a bronchitis attack and was not allowed to return to work.[32]  Before that, she worked multiple cleaning jobs, although she testified that she never had any for long and could not remember the longest job she ever had.[33]  Before that, she had stayed at home to raise her children.[34]

Plaintiff stated that she took medication for her thyroid problem and her high blood pressure.[35]  She had an inhaler and a machine at home she used three times a day to help her breathing.[36]  Plaintiff told the ALJ that she needed to inhale something else at times, although she could not pronounce the name of the medication.[37]

---

[30]     Tr. 40-41.  Plaintiff testified that none of her three youngest children had cars, and so they used the bus to get around, but her twenty-six-year-old child owned a car and sometimes drove her places.  Tr. 41.

[31]     Tr. 42.

[32]     Tr. 42.

[33]     Tr. 43.

[34]     Tr. 43.

[35]     Tr. 44.

[36]     Tr. 44-45.

[37]     Tr. 46.  Plaintiff stated that it began with the letter "A."  Id.

Plaintiff had a history of attempted suicide.[38] She said she could be depressed because she had to depend on people to take care of her, but when the ALJ asked if she knew what depression was, Plaintiff answered, "No, sir."[39] She was on "nerve pills" to help calm her down, which she had been taking for about three years.[40]

Plaintiff stated that she could not sit for long and was always moving about her home.[41] She could walk to the grocery store and back, which was about a mile away, because her doctor told her to exercise, but she never went alone, always going in the company of one of her daughters or a neighbor.[42] She said that she could pick out certain items at the grocery store but that whoever accompanied her would do most of the shopping.[43]

Plaintiff's average day consisted largely of watching television[44] and doing circle-the-word puzzles.[45] Plaintiff testified that she could read but that there were certain words she

---

[38]    Tr. 46.

[39]    Tr. 46.

[40]    Tr. 47.

[41]    Tr. 48.

[42]    Tr. 49-50.

[43]    Tr. 50.

[44]    Plaintiff testified that she did not like action movies but enjoyed watching "old movies." Tr. 52.

[45]    Tr. 50-51. Plaintiff stated she never did crossword puzzles, because there she had to look for the word and write it down, which she could not do. Tr. 51. She also told the ALJ that she never did jigsaw puzzles. Id.

could not pronounce, which embarrassed her and meant that she rarely read anything.[46]  She did sometimes try to read her Bible, but she never read the newspaper.[47]  She did not know how to work a computer and neither she nor her children owned one.[48]  One of her daughters paid for and made sure that Plaintiff knew how to work a cell phone.[49]  Plaintiff would dust at home and could load the dishwasher, but her family did the cooking.[50]  She sometimes helped with the laundry, but she always had a family member with her when she did.[51]

### 3.   Plaintiff's Medical Record

On March 15, 2006, John Ferguson, PhD ("Ferguson"), completed a psychological review of Plaintiff.[52]  Ferguson found that Plaintiff had major depressive disorder, meaning that her impairment or combination of impairments was of a severity sufficient to meet or equal one of the impairments listed in the regulations ("Listing"),[53] in this case Listing 12.04 for an affective

---

[46]     Tr. 51.

[47]     Tr. 51-52.

[48]     Tr. 52.

[49]     Tr. 52.

[50]     Tr. 54.

[51]     Tr. 54.

[52]     Tr. 240-57.

[53]     "Listing" refers to impairments listed in Appendix 1 of the Social Security Act regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

disorder.[54]   With respect to Plaintiff's functional limitations, Ferguson opined that Plaintiff had mild restriction in her daily living activities; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of extended duration decompensation.[55]   Ferguson noted that Plaintiff alleged anxiety attacks beginning in 2004, but that they were relieved by doctor-prescribed Xanax.[56]

At the same appointment, Plaintiff told Ferguson that she lived alone, even though she had filled out her form with a statement saying that she lived with family.[57]   She also told him that she watched television, would clean when she was bored, rarely cooked, and did not go to church.[58]   She reported that her children helped her bathe and pick out her clothes.[59]   Ferguson observed that Plaintiff was casually dressed, well groomed, somewhat guarded, and mildly dysphoric, with good memory but impaired judgment and impaired insight.[60]   Ferguson concluded that Plaintiff was incapable of managing funds and that she had a Global Assessment of

---

[54]   Tr. 243.

[55]   Tr. 250.

[56]   Tr. 252.

[57]   Tr. 252.

[58]   Tr. 252.

[59]   Tr. 252.

[60]   Tr. 252.

Functioning level of 55 out of 100.[61]

On August 4, 2006, Karen L. Kinney, D.O. ("Kinney"), completed a psychiatric disability determination examination.[62]  Her report states that Plaintiff had only a tenth grade education.[63]  Plaintiff reported to Kinney that she could go all day without eating and that her appetite was poor unless she took a certain medication.[64]  She also stated that she rarely cooked meals.[65]  She further reported that she would clean if she was bored.[66]  Plaintiff also said that her children helped her pick out clothes and bathe.[67]  Plaintiff stated that she was often too frustrated to go grocery shopping.[68]  She said that she read the Bible but that sometimes she did not understand the words.[69]  She also stated that she could not pronounce words at times and had difficulty comprehending while reading.[70]  Based on her evaluation of Plaintiff's vocabulary and

---

[61]     Tr. 252.

[62]     Tr. 209-211.

[63]     Tr. 210.

[64]     Tr. 209.  The medical records indicate that Plaintiff is between 4'7" and 4'9" tall and weighs between 87 and 98 pounds.  Tr. 134, 440.

[65]     Tr. 210.

[66]     Tr. 210.

[67]     Tr. 210.

[68]     Tr. 210.

[69]     Tr. 210.

[70]     Tr. 210.

fund of knowledge, Kinney concluded that Plaintiff may have borderline intellectual functioning.[71]

On May 17, 2008, Tomas G. Soto, Ed.D, L.P.A. ("Soto"), conducted a psychological examination of Plaintiff.[72] He used three sources of information in drawing his conclusions: (1) Wechsler Adult Intelligence Scale-III ("WAIS-III"); (2) Wide Range Achievement Test-4 ("WRAT-4"); and (3) mental status examination via clinical interview.[73] His report states that Plaintiff did not complete the tenth grade and was in special education classes.[74] He found that Plaintiff's scores in reading did not go beyond the first grade level and were qualitatively consistent with mild mental retardation.[75] During the testing, Plaintiff was able to read fifteen letters and five elementary words.[76]

Plaintiff's full IQ score was 51, which was near the lower boundary of mild mental retardation, i.e. close to being moderately mentally retarded.[77] Plaintiff's performance score was 57, which was higher but still well within the range of mild mental

---

[71]    Tr. 211.

[72]    Tr. 439–443.

[73]    Tr. 439.

[74]    Tr. 439, 442.

[75]    Tr. 442.

[76]    Tr. 442.

[77]    Tr. 442.  The range of scores for mild mental retardation is from 50-55 up to approximately 70.  Id.

retardation.[78]   Soto   concluded   that   Plaintiff's   "test   results
provide a valid estimate of her current intellectual functioning."[79]

### 4.   Vocational Expert Testimony

After   reviewing   the   file   and   listening   to   Plaintiff's
testimony, the vocational expert ("VE"), Wallace Stanfill, testified
that Plaintiff's record showed no substantial gainful activity for
the period in question and, thus, that she had no prior relevant
work experience or transferable skills.[80]

The ALJ asked the VE to assess the vocational ability of a
younger   individual   with   an   eleventh   grade   education   and   no
transferable skills who had the following abilities and limitations:
an ability to occasionally lift twenty pounds and frequently lift
ten pounds with a sit/stand option; an ability to walk six of eight
hours; an unlimited ability to push and pull; no limitation in gross
or fine manipulation; an ability to occasionally climb stairs; an
inability to run or climb ladders, ropes, and scaffolds; an ability
to bend, stoop, crouch, crawl, balance, twist, and squat; a limited
ability to withstand dust, fumes, gases, and chemicals; an ability
to   get   along   with   others;   an   ability   to   understand   simple
instructions; an ability to concentrate and perform simple tasks;
and an ability to respond and adapt to workplace changes and

---

[78]     Tr. 441.

[79]     Tr. 442.

[80]     Tr. 56.

supervision.[81]

The VE responded that such an individual could perform light, unskilled jobs, including: (1) an electronics worker, with 1,200 local jobs and 210,000 national jobs; (2) a small product assembler, with 1,100 local jobs and 205,000 national jobs; and (3) a shipping/receiving weigher, with 650 jobs locally and 150,000 nationally.[82]

## II.  **Legal Standards**

### A.  **Standard of Review**

This court's review of a final decision by the Commissioner denying disability benefits is limited to determining (1) whether substantial record evidence supports the decision and (2) whether the ALJ applied proper legal standards in evaluating the evidence. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

If the findings of fact contained in the Commissioner's decision are supported by substantial evidence, they are conclusive, and this court must affirm. Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990). Substantial evidence is described as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)); it is "more than a mere scintilla, and less than a

---

[81]    Tr. 56-57.

[82]    Tr. 57.

preponderance." <u>Spellman v. Shalala</u>, 1 F.3d 357, 360 (5th Cir. 1993).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Under this standard, the court must review the entire record but may not reweigh the record evidence, determine the issues de novo, or substitute its judgment for that of the Commissioner.  <u>Brown</u>, 192 F.3d at 496.

**B.    Standard to Determine Disability**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.  <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Specifically, under the legal standard for determining disability, the claimant must prove she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can expect to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(a); <u>see also</u> <u>Greenspan</u>, 38 F.3d at 236.  The existence of such disability must be demonstrated by "medically acceptable clinical and laboratory diagnostic findings."  42 U.S.C. §§ 423(d)(3), (d)(5); <u>see also</u> <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is disabled under this standard, Social Security Act regulations ("regulations") provide

14

that a disability claim should be evaluated according to a sequential five-step process:

> (1) An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.
>
> (2) An individual who does not have a "severe impairment" will not be found to be disabled.
>
> (3) An individual who meets or equals a Listing will be considered disabled without the consideration of vocational factors.
>
> (4) If an individual is capable of performing the work she has done in the past, a finding of "not disabled" will be made.
>
> (5) If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity ("RFC") must be considered to determine if other work can be performed.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps of the inquiry, while the Commissioner bears it on the fifth.  Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498.  The Commissioner can satisfy this burden either by reliance on the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir. 1987).  If the Commissioner satisfies his step-five burden of proof, the burden shifts back to the claimant to prove she cannot perform the work suggested.  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The analysis stops at any point in the process upon a conclusive

finding that the claimant is disabled or not disabled.  Greenspan, 38 F.3d at 236.

### III.  Analysis

**A.   The ALJ's Decision**

In his formal decision, the ALJ followed the five-step process outlined in the regulations, finding at the first step that Plaintiff had not engaged in substantial gainful activity since March 2, 2006.[83]  At step two, the ALJ found that Plaintiff suffered from five severe impairments: 1) hypertension, 2) degenerative disc disease, 3) bronchitis, 4) hypothyroidism, and 5) depression.[84]  The ALJ specifically discounted why he thought Plaintiff's diagnosis of mental retardation was unsupported.[85]  He stated:

> The claimant has also been diagnosed as having mild mental retardation.  Specifically, the record documents that the claimant underwent a psychological evaluation at the request of her representative in May 2008.  During the evaluation the claimant was administered a [WAIS-III] and obtained a Verbal I.Q. score of 53, a Performance I.Q. score of 57 and a Full Scale I.Q. score of 51 which placed her in the low boundaries of mild mental retardation.  The claimant also obtained scores on the [WRAT-4] which indicated that she was virtually illiterate with an ability to read, spell, and perform math at a level indicative of the first grade.  These scores, however, are not considered to be valid as Dr. Soto specifically noted that the claimant's performance "was consistently very inadequate."  Moreover, the doctor noted that despite the scores, the claimant's adaptive behavior was "better developed" as evidenced by her

---

[83]     Tr. 15.

[84]     Tr. 15.

[85]     Tr. 15-16.

ability to care for her basic needs and wants.

The Social Security Regulations define mental retardation as being significantly sub average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (i.e. evidence demonstrate[s] or supports onset of the impairment before age 22).   The record in this case, however, contains no such evidence.   Specifically, the record contains no evidence of any testing of the claimant's intellectual or academic functioning prior to testing performed by Dr. Soto.   It is noted, however, that in filing the application for Social Security benefits, the claimant reported that she had completed the 11th grade, and did not attend special education classes.   Moreover, the record also contains no evidence of deficits in adaptive functioning.   Specifically, the record reflects that the claimant prepares meals, shops, and performs household chores.   During the hearing, the claimant also acknowledged that she performs household chores and shops for groceries.   The claimant also testified that she does word puzzles and reads the Bible. These are not activities consistent with mild mental retardation and reflect a significantly higher level of mental functioning than alleged.   Accordingly, the scores obtained during the May 2008 evaluation are not considered to be valid, and the diagnosis of mental retardation is unsupported.[86]

Proceeding to step three, the ALJ concluded that none of her impairments or combination of impairments were of a severity sufficient to meet or equal one of the Listings, and therefore Plaintiff was not presumptively disabled under the Act.[87]

The ALJ then took into consideration the information contained in Plaintiff's medical records, as well as testimony presented at the hearing, and concluded at step four that Plaintiff retained an

---

[86]    Tr. 14-15 (internal citations omitted).

[87]    Tr. 16.

RFC to perform light work.[88]  Specifically, the ALJ determined that Plaintiff could walk six hours in an eight-hour day and should have a sit/stand option; could lift and carry ten pounds frequently and twenty pounds occasionally; could occasionally climb stairs but could not run or climb ropes, ladders, or scaffolds; could tolerate limited exposure to dust, fumes, and chemicals; could bend, stoop, crouch, crawl, balance, twist, and squat; could get along with others, understand simple instructions, concentrate on and perform simple tasks, and respond and adapt to workplace changes and supervision.[89]  The ALJ then determined that Plaintiff had no past relevant work experience and thus no transferable skills.[90]

The ALJ then evaluated Plaintiff at step five.[91]  Considering her age, education, work experience, and RFC, the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy, such as an electronics worker, a small products assembler, and a shipping/receiving weigher.[92]

Accordingly, the ALJ found Plaintiff "not disabled" and denied her claim for disability and disability insurance benefits under

---

[88]     Tr. 21.

[89]     Tr. 17-18.

[90]     Tr. 21-22.

[91]     Tr. 22-23.

[92]     Tr. 22.

Title XVI of the Act.[93]

**B.    Summary of the Parties' Arguments**

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.  In her motion for summary judgment, Plaintiff argues that the ALJ's decision is not supported by substantial evidence and that the ALJ did not follow proper legal procedures.  Plaintiff presents two arguments: (1) (a) that the ALJ erred at step two by not finding Plaintiff's diagnosis of mild mental retardation to be severe, and (b) that, at step three, Plaintiff fits the criteria of mental retardation under Listing 12.05B; and (2) that, as evidenced by his opinion, the ALJ was biased against Plaintiff.[94]

Defendant, on the other hand, contends that the ALJ employed proper legal standards in reviewing the evidence and that the ALJ's decision is supported by substantial evidence of record.  Defendant therefore maintains that the ALJ's decision should be affirmed.

**C.    Supplementing the Record with New Evidence**

Plaintiff requests the court to allow her to supplement the administrative record with new and material evidence.[95]  After the ALJ denied her request for benefits, Plaintiff filed a new Title XVI

---

[93]    Tr. 23.

[94]    Plaintiff's Motion for Summary Judgment, Docket Entry No. 17, pp. 4-7.

[95]    Plaintiff's Motion to Supplement the Administrative Record with New and Material Evidence, Docket Entry No. 16.

application, for which a new, favorable decision was issued after a hearing by a different ALJ.[96]   In this decision, which awarded benefits for a period starting on October 1, 2008, the ALJ found that Plaintiff had two severe impairments: (1) anxiety disorder and (2) mental retardation.[97]

At step three, the ALJ for Plaintiff's new application found the Plaintiff to be presumptively disabled because she met the requirements of Listing 12.05B.[98]   In so doing, the ALJ stated, in full:

In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of [20 C.F.R. § 416.929] and SSRs 96-4p and 96-7p.   The undersigned has also considered the opinion evidence in accordance with the requirements of [20 C.F.R. § 416.927] and SSRs 96-2p, 96-6p and 06-3p.

The claimant's impairments meet [L]isting 12.05B.   The "paragraph B" criteria of this [L]isting are met because the claimant has mental retardation initially manifested before age 22 with a valid verbal, performance, or full scale IQ of 59 or less.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible.

The claimant underwent a cognitive and literacy assessment in May 2008.   The claimant's history involves a ninth grade education and required special education

---

[96]   Id. Ex. A, ALJ Decision Dated May 12, 2009.

[97]   Id. at 1, 3.

[98]   Id. at 3.

services.   A mental status examination revealed a
"markedly detached" individual with moderately depressed
mood.   The claimant was unable to respond to probing
questions, and her speech was hindered by word
articulation problems.   The examiner reported that the
claimant was disoriented in all three spheres and failed
serial three subtractions.   An intelligence test revealed
a verbal IQ of 53, performance IQ of 57, and full scale
IQ of 51.   She was diagnosed with mild mental
retardation.   The examiner further reported that the
claimant is functionally illiterate and her low cognitive
endowment has been consistent throughout her
developmental period and adult life.

A medical expert reviewed the claimant's medical
evidence.   At the hearing, the medical expert testified
that the claimant's symptoms meet the criteria of
[Listing] 12.05B of the listed impairments with a full
scale IQ of 51.[99]

Plaintiff wishes to submit evidence of the medical expert's opinion

in support of its argument that Plaintiff is disabled under Listing

12.05B.

The court may remand a case to the Commissioner for further

action if there is a showing that new evidence not in the record "is

material and that there is good cause for the failure to incorporate

such evidence into the record in a prior proceeding."   42 U.S.C. §

405(g).   "For new evidence to be material, there must exist the

'reasonable possibility that it would have changed the outcome of

the [Commissioner's] determination'" had the evidence been

presented.   Chaney v. Schweiker, 659 F.2d 676, 679 (5th Cir. 1981).

Material evidence relates to the period for which benefits were

denied, not to later-acquired disabilities or to post-hearing

---

[99]      Id.

deterioration of Plaintiff's condition.   <u>Johnson v. Heckler</u>, 767 F.2d 180, 183 (5th Cir. 1985).

Here, the evidence is new because no medical expert testified at Plaintiff's first hearing.  The evidence is material because the medical expert and the second ALJ relied on medical records that were performed during the period for which Plaintiff requests benefits in the present case, so the new evidence is not based upon later-acquired disabilities or post-hearing deterioration of Plaintiff's condition.[100]   There is also a reasonable possibility that a medical expert's opinion that Plaintiff met the criteria for Listing 12.05B might have changed the outcome of the ALJ's decision in the present case.

However, Plaintiff only submitted to this court the second ALJ's decision summarizing the evidence.[101]  Plaintiff wishes to use the medical expert's opinion that her impairments meet the criteria for Listing 12.05B, but Plaintiff fails to submit a transcript of the medical expert's testimony for the court's consideration.  In other words, Plaintiff has sufficiently shown that the evidence at issue exists without actually submitting the evidence itself. Therefore, the court cannot determine whether the evidence meets the standard allowing Plaintiff to supplement the administrative record, which, if so, would thus require remand.

---

[100]   <u>See id.</u>

[101]   <u>See id.</u>

Accordingly, the court **DENIES** Plaintiff's motion to supplement the administrative record with new and material evidence.

**D.    Step Two: Severity of Mental Impairment**

Regarding Plaintiff's mental impairment, Plaintiff and Defendant conflate their arguments with respect to the ALJ's decision at steps two and three.  The parties mainly argue whether Plaintiff's impairment meets or exceeds the criteria of Listing 12.05B.  However, because the ALJ found at step two that Plaintiff's diagnosis of mental retardation was unsupported, and thus not severe, he did not directly address whether Plaintiff's mental impairment met a Listing.[102]  Thus, the court must first address whether the ALJ erred at step two with respect to his finding that the diagnosis of mental retardation was unsupported.

Plaintiff argues that the ALJ erred when he failed to find at step two that she has a severe mental impairment.  Plaintiff further argues that her medical evidence and testimony support the contention that her mental impairment is severe within the meaning of the regulations.  Plaintiff avers that the ALJ failed to consider, ignored, or misconstrued certain evidence and therefore committed error when finding Plaintiff's mental impairment not severe.

At step two of the analysis, an ALJ considers whether the claimant has a medically determinable impairment or combination of

---

[102]    <u>See</u> Tr. 16–17.

impairments that are severe. 20 C.F.R. § 416.920(c). Severeness is determined by whether the impairment or combination of impairments significantly limits the claimant's ability to perform basic work activities; an impairment or combination of impairments is not severe when evidence establishes only a slight abnormality that would only have a minimal effect on the claimant's ability to work. 20 C.F.R. § 416.921; Social Security Ruling ("SSR") 85-28, 1985 WL 56856 (S.S.A. 1985); SSR 96-3p, 1996 WL 374181 (S.S.A. July 2, 1996); SSR 96-4p, 1996 WL 374187 (S.S.A. July 2, 1996).

Like Plaintiff, the court takes issue with the ALJ's handling and characterization of the evidence with respect to Plaintiff's mental impairment. First, the ALJ did not address or even refer to Kinney's examination or her conclusion that Plaintiff may have borderline intellectual functioning, based on Kinney's evaluation of Plaintiff's vocabulary and fund of knowledge.[103] An ALJ ultimately may give less weight to the medical opinion of any physician when her statements are conclusory, unsupported, or otherwise incredible. Greenspan, 38 F.3d at 237. However, when deciding to do so, the ALJ must indicate the specific reasons for discounting the treating source's medical opinion. See SSR 96-2p. The ALJ has not done so with respect to Kinney's evaluation.

Next, with respect to Soto's reported observations, the ALJ stated that Plaintiff's "scores, however, are not considered to be

---

[103]    Tr. 211.

valid as Dr. Soto specifically noted that the claimant's performance
'was consistently very inadequate.'"[104]   The ALJ seems to construe
this phrase as meaning that Plaintiff, throughout her testing, did
not perform as she ought to have been able to do.[105]   After examining
this phrase in the context of Soto's report, however, the court
finds that the ALJ's interpretation is unreasonable.   Immediately
after stating that her "performance was consistently very
inadequate," Soto states that:

> Her fund of general information, judgment in social
> situations, concentration and mental arithmetic
> computation are all severely retarded. She seems to do
> a trifle better in simple tasks requiring elementary
> visual perception but even here her ability was very
> depressed and limited.   She is unable to plan ahead
> adequately and her perception of the world around her is
> vague, her thinking is fragmented.[106]

The context, therefore, solely supports the interpretation that
Soto's comment that Plaintiff's "performance was consistently very
inadequate" referred to the fact that Plaintiff was not able to
perform well on any parts of the test, not that she was failing to
put forth effort on the test.   This is also supported by Soto's
conclusion that Plaintiff's "test results provide a valid estimate
of her current intellectual functioning."[107]

   Soto did not simply conclusorily state his overall opinion as

---

[104]   Tr. 15.

[105]   Tr. 15.

[106]   Tr. 441.

[107]   Tr. 442.

to Plaintiff's test performance; he also included in his findings examples of Plaintiff's response pattern during the test.[108]   He stated:

> Some of her responses were particularly interesting.  To the question "Who was Martin Luther King, Jr.?" [s]he said "He was a black man, that's all I know.  He was a black man."  To the question "What is the thing to do if you find an envelope in the street that is sealed, and addressed and has a new stamp?" [s]he paused and said "[Y]ou don't mess with it and that's all.  You don't mess with it."  On the Abstract reasoning sub test, she failed to find simple analogies to abstract reasoning tasks.  When asked "In what ways are a piano and a drum alike?" [s]he failed to respond.  But when asked "In what ways are an orange and a banana alike?" she said "[T]hey are foods."   This response pattern suggest[s] that she responds when able to do so.[109]

Soto concluded that Plaintiff's "response pattern contraindicate[d] malingering."[110]  He also "estimated that her low cognitive endowment has been consistent throughout her developmental period and adult life."[111]   Thus, Soto's observations lead him to believe that Plaintiff was not attempting to manipulate her answers to achieve lower scores.  The ALJ's cramped interpretation of Soto's meaning with respect to Plaintiff's consistently inadequate performance was, therefore, unreasonable.

The ALJ also stated with respect to Soto's report: "Moreover, the doctor noted that despite the scores, the claimant's adaptive

---

[108]   Tr. 441.

[109]   Tr. 441.

[110]   Tr. 441.

[111]   Tr. 441.

behavior was 'better developed' as evidenced by her ability to care for her basic needs and wants."[112]   Soto did not actually use the phrase "despite the scores" in reference to Plaintiff's adaptive behavior.[113]   He had found that Plaintiff's full IQ score was 51, which was near the lower boundary of mild mental retardation, i.e. close to being moderately mentally retarded.[114]   His statement that Plaintiff's "adaptive behavior [was] better developed" does not militate against his finding that she suffered from mild mental retardation.   In fact, Plaintiff's performance score was 57, which was still well within the range of mental retardation.[115]   Simply because Plaintiff can care for her "basic needs and wants" does not mean that Soto's conclusions are invalid.

Next, the ALJ conflated steps two and three of the analysis by discussing under step two whether Plaintiff met the Listing at step three, such as whether there was evidence of deficits in adaptive functioning and whether there was evidence that demonstrated or supported the onset of the impairment before age twenty-two.   See 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listing 12.05B).   By conflating the sequence, the ALJ undermined the reasons behind having an analysis of five separate steps.   The ALJ used the Listing for

---

[112]   Tr. 15

[113]   See Tr. 442.

[114]   Tr. 442.   The range of scores for mild mental retardation is from 50-55 up to approximately 70.   Id.

[115]   Tr. 441.

mental retardation as his standard for deciding whether Plaintiff had a severe impairment.[116]  At step two, the ALJ need only determine whether the impairment or combination of impairments significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 416.921.  Only if the ALJ determines at step two that the impairment is severe should he consider whether the impairment meets a Listing.  See, e.g., Davis v. Heckler, 748 F.2d 293, 297 (5th Cir. 1984) (stating that, upon finding that an impairment is not severe, an ALJ need not consider whether the plaintiff's impairment limits her ability to perform other types of work).

With respect to Plaintiff's education, the ALJ concluded that she completed the eleventh grade and took no special education classes, information which the ALJ appears to have taken from Plaintiff's adult disability report, form SSA-3368.[117]  However, there is a discrepancy in the record with respect to Plaintiff's grade completion and type of education, although all records agree that she did not graduate high school.[118]  First, Plaintiff appears not to remember about what year she stopped going to school, as she failed to fill out that portion of form SSA-3368.[119]  Second, Kinney's psychiatric disability determination examination report

---

[116]    Tr. 15.

[117]    Tr. 15, 140.

[118]    See, e.g., 140, 210-11, 439.

[119]    See Tr. 140.

states that Plaintiff had only a tenth grade education.[120]   Third, Soto's psychological report states that Plaintiff did not complete the tenth grade and was in special education classes.[121]   Despite these discrepancies, the ALJ did not attempt to clarify them by questioning Plaintiff about her educational background during the hearing.[122]   When posing a hypothetical to the VE, the ALJ simply assumed a person with an eleventh grade education who was not in special education classes.[123]   The ALJ did not explain why he chose to only credit Plaintiff's educational credentials that were written on an uncompleted form, something which he should have done given the discrepancy in the record.

The ALJ's characterization of Plaintiff's activities is also flawed with respect to his discussion of possible deficits in Plaintiff's adaptive functioning.[124]   Plaintiff's argument here essentially states that the ALJ's decision is not based on a complete and accurate review of the evidence.   An ALJ's determination of disability status must be based on the evidentiary record as a whole.  Villa v. Sullivan, 895 F.2d 1019, 1023 (5th Cir. 1990).  Here, the ALJ stated that there was no evidence deficits in

---

[120]     Tr. 210.

[121]     Tr. 439, 442.

[122]     See Tr. 30-58.

[123]     Tr. 56.

[124]     Tr. 15-16.

adaptive functioning because "the record reflects that [Plaintiff] prepares meals, shops, and performs household chores;" because Plaintiff testified that "she performs household chores and shops for groceries;" and because she further testified that "she does word puzzles and reads the Bible."[125]

With respect to Plaintiff's meal preparation, the evidence shows that Plaintiff testified on May 20, 2008, that her family did the cooking.[126]  On Plaintiff's daily activity questionnaire dated July 17, 2006, Plaintiff reported that Mr. Womack and her daughter helped her prepare her meals, but that she would sometimes try to make pork chops and cornbread.[127]  Later in the same questionnaire she stated that she would often start to make cornbread, but someone else would have to finish it.[128]   During Kinney's psychiatric disability determination examination on August 4, 2006, Plaintiff reported that she could go all day without eating and that her appetite was poor unless she took a certain medication.[129]  She also then stated that she rarely cooked meals.[130]

With respect to her performance of household chores, the

---

[125]    Tr. 15-16.

[126]    Tr. 54.

[127]    Tr. 159.

[128]    Tr. 160.

[129]    Tr. 209.  The medical records indicate that Plaintiff is between 4'7" and 4'9" tall and weighs between 87 and 98 pounds.  Tr. 134, 440.

[130]    Tr. 210.

evidence shows that Plaintiff testified on May 20, 2008, that she could dust and put dishes in the dishwasher.[131]  She also testified that she could sometimes help with the laundry, but a family member was always with her then.[132]  On Plaintiff's daily activity questionnaire dated July 17, 2006, Plaintiff reported that Mr. Womack and her daughter helped her complete household chores such as doing laundry, mopping, and vacuuming.[133]  During Kinney's psychiatric disability determination examination on August 4, 2006, Plaintiff reported that she would clean if she was bored.[134]  Plaintiff also reported at that time that her children helped her pick out clothes and bathe.[135]

With respect to Plaintiff's shopping, the evidence shows that Plaintiff testified on May 20, 2008, that she did not have a driver's license, did not drive, and did not use the bus by herself.[136]  She further testified that when she walked to the store, she was always accompanied by one of her children or a neighbor.[137]

---

[131]    Tr. 54.

[132]    Tr. 54.

[133]    Tr. 159.

[134]    Tr. 210.

[135]    Tr. 210.

[136]    Tr. 38-39.  During Kinney's psychiatric disability determination examination on August 4, 2006, Plaintiff reported that she would not use a bus or a taxi alone.  Tr. 210.

[137]    Tr. 39, 49.  Plaintiff affirmatively stated that she "never" went to the store by herself.  Tr. 49.

When the ALJ asked her what groceries she bought at the store, Plaintiff stated that it was really her daughters or neighbors who went to the store to do the shopping, and she would "pick out certain things" but they mostly did the grocery shopping.[138]   On Plaintiff's daily activity questionnaire dated July 17, 2006, Plaintiff also reported that Mr. Womack and her daughter helped her with her shopping.[139]   Later in the same questionnaire, she reaffirmed that she never went anywhere alone.[140]   During Kinney's psychiatric disability determination examination on August 4, 2006, Plaintiff reported that she was often too frustrated to go grocery shopping.[141]

With respect to her word puzzles, the evidence shows that Plaintiff testified on May 20, 2008, that her family makes sure she has plenty of puzzle books, which she enjoyed doing each day.[142]   She stated that she only worked on the puzzles where all she had to do was circle the words.[143]   She stated that she "never" did crossword puzzles "because you have to look for the word and write the word down."[144]   Plaintiff affirmed that she had no other kind of puzzle

---

[138]   Tr. 50.

[139]   Tr. 159.

[140]   Tr. 161.

[141]   Tr. 210.

[142]   Tr. 50-51.

[143]   Tr. 51.

[144]   Tr. 51.

books and that she did not put together jigsaw puzzles.[145]

Finally, with respect to reading the Bible, the evidence shows that Plaintiff testified on May 20, 2008, that she could read but did not really like to read, because "certain words [she couldn't] get out and it [was] embarrassing if you can't pronounce it right . . . ."[146] When the ALJ prompted her by asking if she liked to read anything "just generally," Plaintiff responded, "I try to read [my Bible]."[147]  Plaintiff also affirmed that she did not read the newspaper.[148]  During Kinney's psychiatric disability determination examination on August 4, 2006, Plaintiff reported that she read the Bible but that sometimes she did not understand the words.[149]  She also stated that she could not pronounce words at times and had difficulty comprehending while reading.[150]  During Plaintiff's psychological examination on May 17, 2008, Soto found that Plaintiff's scores in reading did not go beyond the first grade level and was qualitatively consistent with mild mental retardation.[151]  During the testing, Plaintiff was able to read

---

[145]    Tr. 51.

[146]    Tr. 51.

[147]    Tr. 51.

[148]    Tr. 51.

[149]    Tr. 210.

[150]    Tr. 210.

[151]    Tr. 442.

fifteen letters and five elementary words.[152]

The ALJ conclusorily decided that Plaintiff's activities were inconsistent with mild mental retardation and reflected a significantly higher level of mental functioning than alleged.[153] However, the ALJ never discussed any appropriate standard for determining what were or were not activities consistent with mild mental retardation, instead incorrectly choosing to use the step three analysis at step two.

The Fifth Circuit has not directly addressed by what standard an ALJ should judge whether a Plaintiff's mental impairment is severe at step two. However, the Eighth Circuit, among others, has addressed the issue and determined that the DSM-IV standard[154] for evaluating mental retardation is useful, although the court expressly noted that the medical standard for mental retardation is not identical to the legal standard. <u>Cox v. Astrue</u>, 495 F.3d 614, 618 & n.4 (8th Cir. 2007). The DSM-IV states:

> The essential feature of mental retardation is significantly subaverage general intellectual functioning (further defined as an IQ standard score of approximately 70 or below), that is accompanied by significant limitations in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources,

---

[152]   Tr. 442.

[153]   Tr. 16.

[154]   "DSM-IV" stands for "Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition." The manual is published by the American Psychiatric Association and covers all mental health disorders for both children and adults. The book is generally considered the "bible" for any professional who makes psychiatric diagnoses in the United States.

> self-direction, functional academic skills, work,
> leisure, health, and safety.

DSM-IV (4th ed. text revision, 2000).

In this case, the ALJ appears to have focused more on Plaintiff can do, failing to assess and recognize what Plaintiff cannot do. As the court has discussed above, Plaintiff clearly appears to have significant limitations in at least two of the skill areas listed in the DSM-IV; certainly Plaintiff has limitations enough to warrant a finding of "severe" at step two of the ALJ's analysis.[155]   The ALJ's broad statement that "the record . . . contains no evidence of deficits in adaptive functioning" cannot be sustained.[156]

The ALJ's belief in what activities are consistent with a diagnosis of mild mental retardation also appears to be misguided.[157] The ALJ stated that Plaintiff could prepare meals, shop for groceries, perform household chores, do word puzzles, and read the Bible.[158]   According to the DSM-IV, these are not necessarily inconsistent with mild mental retardation:

> Mild Mental Retardation is roughly equivalent to what
> used to be referred to as the educational category of

---

[155]   To be clear, the court is not requiring the ALJ to use the DSM-IV standard when making a decision at step two with respect to a plaintiff's mental impairment.  The court is only stating that using the step three standard of Listing 12.05 at step two is inappropriate and that the ALJ must use some other, appropriate, standard by which to judge whether a plaintiff's mental impairment is severe enough to meet the requirements of step two, especially in the absence of testimony by a medical expert.

[156]   Tr. 15.

[157]   See Tr. 16.

[158]   Tr. 15-16.

> "educable."  This group constitutes the largest segment
> (about 85%) of those with the disorder.  As a group,
> people with this level of Mental Retardation typically
> develop social and communication skills during the
> preschool years (ages 0-5 years), have minimal impairment
> in sensorimotor areas, and often are not distinguishable
> from children without Mental Retardation until a later
> age.  By their late teens they can acquire academic
> skills up to approximately the sixth-grade level.  During
> their adult years, they usually achieve social and
> vocational skills adequate for minimal self-support, but
> may need supervision, guidance, and assistance,
> especially when under unusual social or economic stress.

DSM-IV, at 42-43.  Accordingly, the ALJ's statement that Plaintiff's activities "are not activities consistent with mild mental retardation and reflect a significantly higher level of mental functioning than alleged" is unsupported.[159]

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).  The court may not reweigh the evidence or substitute its judgment for Defendant's judgment.  Brown, 192 F.3d at 496.  Here, a review of the record, including the medical reports and Plaintiff's testimony, show that the ALJ's decision is not supported by substantial evidence.  The court must review the record with an eye toward determining whether the ALJ's decision is supported by more than a scintilla, but less than a preponderance of evidence.  See Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  The court does not find more than a scintilla of evidence in support of the ALJ's decision.

---

[159]    Tr. 16.

36

The ALJ is granted the authority to determine which disabilities and limitations are supported by the evidence, and the court should overturn the ALJ's determinations "only where there is a conspicuous absence of credible choices or no contrary medical evidence." Johnson, 864 F.2d at 343-44 (internal quotation marks omitted); see also Brown, 192 F.3d at 496. Here, however, upon review of the complete record, the court finds that the ALJ's decision at step two was not supported by substantial evidence. The evidence as reviewed by the court contains "a conspicuous absence of credible choices." See Johnson, 864 F.2d at 343-44. Therefore, the court overturns the decision of the ALJ at step two and finds that Plaintiff's mental impairment meets the legal standard for a severe impairment.

In conclusion, the court finds a lack of substantial evidence to support the ALJ's decision not to include Plaintiff's allegations of mental impairment in the step two determination of severe impairments.

**E.   Step Three: Listing 12.05**

The parties also argue whether, if Plaintiff meets the requirements at step two, she meets the requirements of Listing 12.05B. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. Listing 12.05 states, in relevant part:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the

> evidence demonstrates or supports onset of the impairment
> before age 22.
>
> The required level of severity for this disorder is met
> when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> B.   A valid verbal, performance, or full scale IQ of 59
>      or less.

20 C.F.R. Pt. 404, Subpt. P, App. 1.  While Plaintiff argues that she meets all of the criteria to meet this Listing, Defendant argues that (1) there is no evidence supporting the onset of the impairment before age 22, and that (2) there is no evidence with respect to Plaintiff's IQ, since the ALJ discounted Soto's opinion.

Because the ALJ erred at an early stage of the proceedings, and a step two error necessarily impacts the remaining steps of the sequential disability determination process, the court need not reach the issue of whether Plaintiff meets the criteria for Listing 12.05B.  Having found that the ALJ erred at step two, the court remands the case for the ALJ to consider whether Plaintiff's mental impairment, by itself or in combination with Plaintiff's other severe impairments, meets or exceeds the criteria of any of the Listings.  However, the court does note, without deciding, that there appears to be sufficient evidence of record to meet the criteria for Listing 12.05B.  The court also notes that testimony by a medical expert may be useful and appropriate in this case in

determining whether Plaintiff meets a Listing.[160]

**F.   Alleged ALJ Bias**

In addition to requesting the court to remand this case, Plaintiff further requests that the court order the case be remanded to a different ALJ "to insure that the letter and spirit of any such remand is followed and that any further proceedings are limited to that which is minimally required to resolve the remaining issues."[161] Plaintiff argues that the record demonstrates that the ALJ was biased in this case "because he has a proclivity to pick and choose record evidence to support his pre-judgment and to make irrational conclusions from phrases that he has plucked from their natural context."[162]   Plaintiff specifically takes issue with the ALJ's handling of Soto's phrase that Plaintiff's performance "was consistently very inadequate."[163]

"Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or

---

[160]    Generally, the ALJ's decision to consult a medical expert is a discretionary one.  See Haywood v. Sullivan, 888 F.2d 1463, 1467-68 (5ᵗʰ Cir. 1989).  The ALJ may ask for and consider the opinion of a medical expert on the nature and severity of an impairment or its equivalence to any listed impairment if the ALJ feels it is necessary; however, the final responsibility for deciding whether an impairment meets or equals a listed impairment is reserved to the Commissioner.  Id.; see generally 20 C.F.R. §§ 416.926(e), 416.927(e).

[161]    Plaintiff's Motion for Summary Judgment, Docket Entry No. 17, p. 5.

[162]    Id.

[163]    Id.

antagonism that would make fair judgment impossible." <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994). "[J]udicial rulings along almost never constitute a valid basis for a bias or partiality motion" unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." <u>Brown</u>, 192 F.3d at 500 (quoting <u>Liteky</u>, 510 U.S. at 555). Thus, the bar for making a finding of judicial bias is set high.

Here, although the court agrees with Plaintiff that the ALJ misconstrued Soto's statement, there is not evidence that he did so deliberately and with such antagonism that he would be unable to follow the court's directions upon remand. Although the court believes the ALJ's decision was not based upon substantial evidence with respect to step two, his analysis does not give the court concern that he was biased to such a degree that another ALJ should look at the case upon remand.

Accordingly, the court refuses Plaintiff's request and will not order that another ALJ be assigned to her case upon remand.

**G.  Defendant's Argument**

Defendant asserts in his response that the ALJ's decision should be affirmed because the ALJ properly determined Plaintiff was never under a disability.

In light of the foregoing, however, the court finds that the ALJ's decision is not supported by substantial evidence. This case is remanded to the Commissioner for further disposition. In

reconsidering Plaintiff's case in light of this memorandum, the Commissioner may take any action necessary to complete the administrative record and issue a new decision.  The court cautions Plaintiff that this reconsideration may not alter the substance of the current disability determination.

## IV.  <u>Conclusion</u>

Based on the foregoing, the court **DENIES** Plaintiff's Motion to Supplement (Docket Entry No. 16) and **GRANTS** Plaintiff's Motion for Summary Judgment (Docket Entry No. 17).  The case is **REMANDED** to the Commissioner for reconsideration consistent with this opinion.

**SIGNED** in Houston, Texas, this 23rd day of March, 2010.


Nancy K. Johnson
United States Magistrate Judge

41